UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MARJAM SUPPLY COMPANY, INC.,<br>Plaintiff<br><br>v.<br><br>EVERETT RIKEMAN,<br>Defendant | Civil Action No. 05 10570 RWZ |

### AFFIDAVIT OF DEFENDANT EVERETT RIKEMAN IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, Everett Rikeman, hereby depose and state:

1. My name is Everett Rikeman. I am the Defendant in the above-captioned matter. I believe and therefore aver that the Request for Preliminary Injunction filed by my former employer, Plaintiff Marjam Supply Company, Inc. ("Marjam"), is an unjustified and improper attempt by Marjam to prevent me from pursuing my livelihood as a salesman of construction materials.

2. As will be further explained in more detail below, I did not take any documents or confidential information from Marjam; did not take materials from any Marjam customer; and do not seek to rely on any customer goodwill or confidential vendor information belonging to Marjam.

### My Experience and Background in the Business

3. I have sold construction materials (principally acoustical ceiling supplies) for almost twenty-five (25) years. I worked for Marjam for less than three and a half (3 1/2) of those twenty-five (25) years.

4. In June 1981, just out of high school, I started as a truck driver and warehouse worker with what was then a relatively new and still small company called Kamco Supply Corp. of Boston ("Kamco"). I was the fifth employee at Kamco, which now has seven (7) offices in four (4) states, approximately 230 employees, and is the dominant supplier of acoustical ceiling supplies in New England.

5. I worked at Kamco for almost 20 years, mostly as a salesman.

6. Upon leaving Kamco, I worked for Cheviot Corporation ("Cheviot"), a union contractor. I had some sales responsibility at Cheviot, but also performed other tasks for the contracting side of Cheviot's business.

My General Experience with Marjam

7. I left Cheviot and began working for Marjam on or about September 21, 2001. I was a salesman at Marjam, again principally of acoustical ceiling supplies.

8. My job responsibilities at Marjam were very similar to what I had performed as a salesman at Kamco. I spent much of my time on the telephone, speaking with prospective and current customers, and also manufacturers (principally Armstrong World Industries, Inc. ("Armstrong")). This is also true since I recently left Marjam and returned to work at Kamco.

9. Both Kamco and Marjam are authorized distributors of "Armstrong" brand acoustical ceiling supplies. Kamco and Marjam buy building supplies from Armstrong (and certain other manufacturers) and then sell those supplies to contractors.

10. Salesmen possess very few if any "secrets" in my business. On the "upstream" side, Armstrong's building supplies are made available equally to Kamco and

Marjam, and at the same prices. Kamco and Marjam thus carry substantially the same products for resale to their customers, at substantially the same prices.

11.  On the "downstream" side, the names and addresses of contractors in the business of installing acoustical ceiling systems are readily available from various public sources, including telephone books and trade listings of contractors by specialization. In addition, the larger and more established contractors are well known within the industry.

12.  Moreover, contractors typically solicit bids from two or more suppliers when estimating the cost of construction projects they are considering undertaking. It is not unusual for the same contractor to contact both Kamco and Marjam to solicit bids when the contractor is considering a project, since Kamco and Marjam are both major suppliers of acoustical ceiling supplies throughout New England.

13.  A contractor ultimately decides to place a materials order with a supplier based upon a number of major factors, other than merely the identity of a salesperson. These include: pricing, credit policies, delivery and availability of product (both promised, and experienced with past orders), return policies, and overall service and responsiveness. The above-referenced factors are all largely if not fully out of the control of the salesperson.

### The Non-Compete

14.  I do not remember signing an Employment Agreement with Marjam, a copy of which is allegedly attached to the Complaint as Exhibit A ("Exhibit A Document"). The Exhibit A Document is dated as of my first day of work for Marjam, and that day I signed a number of what I thought were routine employment-related documents, but I have no memory of specifically signing the Exhibit A Document.

15. No one from Marjam ever asked me to sign any document that they identified to me as a non-competition covenant. No one from Marjam ever told me that any document given to me by Marjam for signature by me contained a non-competition covenant. No one from Marjam ever explained any non-competition covenant to me, or suggested I obtain advice of counsel prior to signing any document.

16. I did not intend to sign a non-competition covenant with Marjam. If the subject of a non-competition covenant had been raised, I would have refused to sign such a covenant, at least without some additional consideration for signing. I was never informed of Marjam's allegation that I had executed a non-competition covenant until after I had left Marjam's employ.

## Other Matters

17. I do not know what customer Marjam is referring to when they allege in their Complaint (¶ 16) that I took materials from a customer under the guise of borrowing said materials. However, I did not take materials from any customer, nor did I "borrow" materials from a customer.

18. I did not take any materials from Marjam when I left their employ.

19. I did not take any confidential information or trade secrets from Marjam when I left their employ.

20. I returned to work for Kamco because I like and respect my co-workers at Kamco and the organization they have created. By contrast, I found Marjam to be a very difficult place to work. At Marjam I was responsible to and supervised by many different "bosses". Marjam's strict credit policies and lax warehouse/delivery practices also made my job as salesman much harder than it needed to be. Perhaps most fundamentally,

4

Marjam fosters a "Big Brother" workplace, where your actions and work as an employee are constantly subject to invasive surveillance and monitoring, which I found degrading and counterproductive.

21. I believe and therefore aver that I am not "misappropriating" any customer goodwill that belongs to Marjam. Contractors typically deal with multiple suppliers, and have any number of reasons for choosing to purchase supplies from Kamco, for example, as opposed to Marjam. Since leaving Marjam to return to work with Kamco, no customer could reasonably have had the mistaken impression that I am still working at Marjam, and not Kamco.

22. I also believe and therefore aver that it would be fundamentally unfair to bar me from contacting every "Marjam customer" with whom I conducted business while a Marjam employee, as is requested by Marjam in their request for a Preliminary Injunction. Many "Marjam customers" are "Kamco customers" as well, since contractors often trade with both Marjam and Kamco. Indeed, many "Marjam customers" were customers I serviced at Kamco before I ever worked at Marjam.

23. My abilities as a salesperson are in no way unique. I do not have any specialized education, training or knowledge beyond basic familiarization, training and experience.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 1st DAY OF APRIL, 2005.

*Everett F. Rikeman*
Everett Rikeman

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon each party appearing pro se and the attorney of record for each other party by mail (by hand) on 4/6/05